613 S.E.2d 81

Amy C. **SEXTON** and John S. **Sexton,** jointly, individually, and as the parents and natural guardians of Kara Taylor Sexton, a minor, Plaintiffs Below, Appellants,

v.

Anthony M. **GRIECO,** M.D., Paul Megehee, M.D., and Marshall University School of Medicine, Defendants Below, Appellees.

No. 31758.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 18, 2005.

Decided Feb. 10, 2005.

Robert F. Daley, Esq., R. Scott Marshall, Esq., D. Aaron Rihn, Esq., Pierce, Raimond and Coulter, Huntington, for Appellants.

D.C. Offutt, Esq., Stephen S. Burchett, Esq., Offutt, Fisher & Nord, Huntington, for Appellee, Dr. Grieco.

Edward M. Kowal, Jr., Esq., Andrew P. Ballard, Esq., Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, for Appellees Dr. Megehee and Marshall University School of Medicine.

PER CURIAM.

John S. and Amy C. Sexton (hereinafter referred to as "the Sextons"), appellants/plaintiffs below,[1] appeal from a decision by the Circuit Court of Cabell County granting judgment as a matter of law to Anthony M. Grieco, M.D., Paul Megehee, M.D., and Marshall University School of Medicine, appellees/defendants below (hereinafter collectively referred to as "the defendants"). In this medical malpractice action, the circuit court granted judgment as a matter of law to the defendants, after the close of the Sextons' case-in-chief, on the grounds that the Sextons failed to establish that the conduct of the defendants was the proximate cause of the injury to their infant child, Kara Taylor Sexton. Here, the Sextons allege that proximate cause was established. Alternatively, the Sextons contend the circuit court should have permitted them to reopen their case-in-chief to put on further evidence. After a careful review of the briefs and record, and listening to the arguments of the parties, we reverse the lower court's ruling and remand this case for a new trial.

## I.

### FACTUAL AND PROCEDURAL HISTORY

On or about February 25, 1999, Mrs. Sexton gave birth to Kara. The defendants pro-

---

1. The Sextons, husband and wife, also brought this action on behalf of their infant child, Kara Taylor Sexton.

vided obstetrical medical services to Mrs. Sexton throughout her delivery. During the birthing process, which apparently was being observed by Mr. Sexton, complications arose in extracting Kara from the womb. As a result of the complications, Kara was born with a left shoulder injury, called Erb's Palsy.

Subsequent to Kara's birth, the Sextons filed a medical malpractice action against the defendants alleging that the defendants were negligent by not performing a caesarian section to deliver Kara. The Sextons further alleged that the defendants used excessive force that included improper use of forceps and the application of fundal pressure on Mrs. Sexton. The case ultimately progressed to a jury trial that was commenced on September 22, 2003.

During the Sextons' case-in-chief, they called Dr. James O'Leary to provide medical expert testimony on the issues of standard of care and causation. At the close of the Sextons' case-in-chief, the defendants moved for judgment as a matter of law. The defendants argued that, although Dr. O'Leary testified as to a deviation from the standard of care, he failed to explicitly testify that the defendants' deviation from the standard of care was the proximate cause of Kara's injuries. The Sextons argued in response that Dr. O'Leary's testimony was sufficient for the jury to infer causation. The trial court agreed with the defendants and granted their motion. After the trial court granted judgment as a matter of law to the defendants, the Sextons moved the court to reopen their case-in-chief to allow further testimony on the issue of causation. The trial court denied the motion. From these rulings the Sextons appeal.

## II.

### STANDARD OF REVIEW

■ In this proceeding we are asked to review the trial court's ruling granting judgment as a matter of law to the defendants at the close of the Sextons' case-in-chief. The standard of review on this issue, as set out in Syllabus point 5 of *Smith v. First Communi-*

*ty Bancshares, Inc.,* 212 W.Va. 809, 575 S.E.2d 419 (2002), is as follows:

The appellate standard of review for the granting of a motion for a [judgment as a matter of law] pursuant to Rule 50 of the West Virginia Rules of Civil Procedure is de novo. On appeal, this court, after considering the evidence in the light most favorable to the nonmovant party, will sustain the granting of a [judgment as a matter of law] when only one reasonable conclusion as to the verdict can be reached. But if reasonable minds could differ as to the importance and sufficiency of the evidence, a circuit court's ruling granting a [judgment as a matter of law] will be reversed.

*Accord* Syl. pt. 3, *Brannon v. Riffle,* 197 W.Va. 97, 475 S.E.2d 97 (1996).

## III.

### DISCUSSION

■ The dispositive issue is whether the circuit court was correct in ruling that the Sextons failed to present sufficient evidence to establish a prima facie showing that the defendants' negligence was the proximate cause of Kara's injuries. We have long recognized that

"[p]roximate cause is a vital and essential element of actionable negligence to warrant a recovery; and the question of proximate cause is for the jury when the evidence relating to it is conflicting, or when the facts, though undisputed, are such that reasonable men may draw different conclusions from them."

Syl. pt. 4, *Pygman v. Helton,* 148 W.Va. 281, 134 S.E.2d 717 (1964). The decisions of this Court have made clear that "[i]n a malpractice case, the plaintiff must not only prove negligence but must also show that such negligence was the proximate cause of the injury." Syl. pt. 4, *Short v. Appalachian OH–9, Inc.,* 203 W.Va. 246, 507 S.E.2d 124 (1998). Thus, "[t]he burden is on the plaintiff to prove by a preponderance of the evidence that the defendant was negligent and that such negligence was the proximate cause of the injury." Syllabus point 2, *Walton v. Given,* 158 W.Va. 897, 215 S.E.2d 647 (1975).

"When the plaintiff's evidence, considered in the light most favorable to him, fails to establish a prima facie right of recovery, the trial court should [grant judgment as a matter of law] in favor of the defendant." Syl. pt. 3, *Roberts v. Gale,* 149 W.Va. 166, 139 S.E.2d 272 (1964).

In Syllabus point 1 of *Pygman,* this Court set out the following rule of law with respect to establishing proximate cause in medical malpractice cases:

Medical testimony to be ... sufficient to warrant a finding by the jury of the proximate cause of an injury is not required to be based upon a reasonable certainty that the injury resulted from the negligence of the defendant. All that is required to render such testimony ... sufficient to carry it to the jury is that it should be of such character as would warrant a reasonable inference by the jury that the injury in question was caused by the negligent act or conduct of the defendant.

Syl. pt. 1, in part, *Pygman,* 148 W.Va. 281, 134 S.E.2d 717. In the instant case, the Sextons concede that "no 'direct' question was asked on the issue of proximate causation at trial[.]" However, the Sextons contend that in looking at all of Dr. O'Leary's testimony, a reasonable inference may be drawn that Dr. O'Leary believed that the defendants' violation of the standard of care was the proximate cause of Kara's injuries.

During direct examination of Dr. O'Leary, the Sextons elicited the following testimony:

Q. Doctor, we've heard a little bit about shoulder dystocia. Explain to the jury briefly what that is.

A. Shoulder dystocia is an emergency situation where the mom will push the baby's head out. The baby's head is completely delivered. And then with the next contraction, the baby's body will not come out. And what happens is simply the shoulder gets stuck on the mother's pelvic bone. And specifically it's the shoulder closest to the mother's bladder right below the hairline in the lower abdomen. So a stuck shoulder is a shoulder dystocia.

. . . .

Q. Now, let's talk about the forceps delivery. Could you explain to the jury what your understanding of the events were during that procedure and what opinions you have concerning whether the defendants Dr. Grieco and Dr. Megehee violated the standard of care?

A. It would be my opinion that they did violate the standard of care by pulling too hard on Kara's head after it was delivered and that they did allow that pressure be exerted on the mother's upper abdomen. And that would make the stuck shoulder more stuck. So both of those things were below the standard of care.

. . . .

Q. Now, I've looked at the medical records, and I'm sure you have, and I have not seen any reference to Kara's head being pulled. How can you say that Kara's head was pulled too hard if its [sic] not in the medical records?

A. I believe there would be several reasons. The first would be the fact I've never seen doctors write "I pulled too hard" or "I pulled strong." It's something that is not written.

The injury itself that we're talking about here is what we call a stretch injury or a pulling of the nerves. And if you look at these medical records, the ultrasounds that were done during the pregnancy do not show that there was an injury to the baby's arm or shoulder. There is nothing unique about this labor that would have caused an injury. And labor itself is a squeezing. Every time the mother has a contraction, the upper two-thirds of the uterus squeezes the baby down and out. There is no stretching during labor. It's like squeezing toothpaste out of a tube. And all the pressure is in the upper two-thirds of the uterus pushing it down.

The area where the neck is, is the lower part of the uterus, which is the thinnest part and does not contract. So there are no contraction forces right over the area that was injured.

So, by exclusion, there are no other causes of something other than stretching of the neck.

And then when you look at the baby's records, there is a note that says "difficult delivery." And there's multiple bruising areas on the baby's face above and beyond the forceps marks themselves.

Q. Doctor, before we get to the bruising marks and before we get to the pressures within contraction, I want to ask you with regard to pulling of the head again. Can you give the jury some idea as to the traction force or the pulling force that is involved in a normal delivery and even in a shoulder dystocia delivery as opposed to what you term pulling too hard?

A. The normal way to describe normal traction or normal pulling is the amount of traction or pulling that you would do everyday when you're delivering babies where the shoulder is not stuck, so we would call that normal. You could call it gentle. You could call it mild. It has been measured and estimated to be five to ten pounds of force.

Pulling hard, and by that I mean very hard, one sign of which would be if you pull very hard on the baby's head, you may pull the mother down on the table. So there's a big safety area called moderate traction.

We're suppose to use gentle, normal or mild pulling. Never use strong traction and never pull straight down towards the floor.

Q. Now, Doctor, let me ask you to assume or not assume. I mean in this case, do you know whether the mother was pulled down from the table?

A. That was stated in the deposition testimony of Mr. Sexton I believe.

. . . .

Q. Now, Doctor, let's go back to the forces, the compressive forces in the womb. I hope I'm using these terms correctly. But with respect to Kara before delivery. And you used the example of the toothpaste, that sort of thing. But I can't help but think that if the mother is pushing and if contractions are going on, why wouldn't those compressive forces injure the brachial plexus?

A. Because they're in the upper two-thirds or three quarters of the uterus.

The lower portion of the uterus does not contract. And even if that pressure were on the brachial plexus, the pressure would be equal on both sides of the neck, so there would be injuries on both sides and not just one nerve. It would be all the nerves in the neck. But these are not pressure injuries. If these were pressure injuries, the baby would show other damage to other tissues in the neck like an automobile accident, for instance.

Q. Now, Doctor, let me ask you to also assume that Dr. Boehm is going to talk about some other cause of this Erb's palsy, being what he terms a maladaptation. . . . And what's your opinion as to whether that contributed to this injury.

A. The so called maladaptation, which really means malpositioning, was described about 20 years ago in the pediatric literatures. That's where a baby that's inside the mother in the last three months of pregnancy is in an abnormal position, such as I'm showing you here, my ear goes to my shoulder. Something in the mother's womb or something in the baby's neck is pushing the head and the ear down like this, and it stays in this position for the last three months of the pregnancy. So it would be a chronic injury. It's not a stretch injury.

If that did occur, after Kara was delivered and put in the nursery, she would go back in this position for one, two or even three weeks. And there would be evidence in the arm of some muscle wasting or loss of muscle, maybe skin change. And by X-ray there would be evidence of osteoporosis. So Kara was not a maladapt patient problem.

. . . .

Q. Let's talk about the bruising. . . . And we've already discussed with the jury that the bruising was on the ears, the left shoulder, both thighs, the right side of the abdomen and the tongue. . . .

What would account for the bruising on the other parts of Kara's body, if this had been a delivery within the standard of care?

A. I could not think of any other reason that the baby's thighs would have been injured. The proper application of the forceps would be up around the head. There's nothing in the record to account for the bruise on the abdomen. The facial bruising and the tongue bruising would be simply the placement of fingers on the face at the time the traction was applied.

. . . .

Q. Now, Doctor, do you have an opinion, based upon a reasonable degree of medical probability, as to whether—as to whether Dr. Megehee's actions violated the standard of care?

A. I believe they did.

Q. And how so?

A. By applying traction to the head of Kara.

Additionally, during cross examination of Dr. O'Leary by counsel for the defendants, the following testimony was given:

Q. So why is Dr. Grieco being held liable here? Why do you think he's liable?

A. Because he pulled too hard.

Q. Based upon what Mr. Sexton says?

A. Based upon the condition of the baby and all the bruising and the permanent injury and no other cause of anything that possibly could have caused that.

As previously indicated, the Sextons contend that the jury could reasonably infer from Dr. O'Leary's testimony that he believed the defendants' conduct was the proximate cause of Kara's injuries. Further, the Sextons argue that under the decision in *Pygman* such an inference is permissible. The defendants disagree.[2]

According to the defendants, the Legislature modified *Pygman* in 1986 when it enacted the Medical Professional Liability Act. *See* W. Va.Code § 55–7B–1. *et seq.* The defendants cite to the following language contained in a provision of the Act to support their contention:

(a) The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care:

(1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

(2) *Such failure was a proximate cause of the injury or death.*

W. Va.Code § 55–7B–3(a) (2003) (Supp.2004) (emphasis added).[3] Thus, the defendants argue "[a]ny declaration short of a plain and unambiguous statement regarding proximate causation fails to satisfy the Legislature's intent contained in W. Va.Code § 55–7B–3." We disagree.

■ It has been long established that "[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syl. pt. 2, *State v. Epperly*, 135 W.Va. 877, 65 S.E.2d 488 (1951). *See* Syl. pt. 4, *Daily Gazette Co., Inc. v. West Virginia Dev. Office*, 206 W.Va. 51, 521 S.E.2d 543 (1999). The above-quoted statutory provision is clear and unambiguous. The statute has merely codified the common law requirements for establishing medical malpractice. *See* Syl. pt. 4, *Hundley v. Martinez*, 151 W.Va. 977, 158 S.E.2d 159 (1967) ("In an action for damages against a physician for negligence or want of skill in the treatment of an injury or disease, the burden is on the plaintiff to prove such negligence or want of skill and that it resulted in injury to the plaintiff."). *See also Pleasants v. Alliance Corp.*, 209 W.Va. 39, 50, 543 S.E.2d 320, 331 (2000) ("West Virginia Code § 55–7B–3 ... [merely] define[s] the necessary elements for proving a medical malpractice cause of action."). Further, we find nothing in the language of

---

**2.** In ruling against the Sextons, the trial court held that "[i]t may easily be possible to infer [causation], but we cannot infer a material part."

**3.** The version of W. Va.Code § 55–7B–3 that technically is applicable to this case was enacted in 1986. Thereafter, W. Va.Code § 55–7B–3 was amended in 2003. The particular language of W. Va.Code § 55–7B–3 that is addressed in this opinion is identical in both the 1986 and 2003 versions of the statute. Consequently, in our discussion of the statute, we will refer to its latest version.

W. Va.Code § 55–7B–3, or anywhere else in the Act, which shows a legislative intent to *prohibit* the proximate cause inference allowed by *Pygman*. Consequently, it was reversible error for the trial court to grant judgment as a matter of law to the defendants on the grounds that proximate cause could not be established through inferences.[4] As we noted in *Hovermale v. Berkeley Springs Moose Lodge No. 1483*, 165 W.Va. 689, 696, 271 S.E.2d 335, 340 (1980), the decision in "*Pygman* specifically rejected the requirement that the [expert] tie the injury to the negligence by way of . . . any rigid incantation or formula[.]"[5]

## IV.

## CONCLUSION

In view of the foregoing, we reverse the circuit court's order granting judgment as a matter of law to the defendants and remand this case for a new trial.

Reversed and Remanded.

---

4. Justice Cleckley noted in *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996), that "[t]he rule in West Virginia is that parties must speak clearly in the circuit court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace." Although we are reaffirming the holding in *Pygman* that proximate cause may be established through inferences, we believe that the better practice would be to ask an expert a direct question as to whether or not an injury was the proximate cause of medical negligence. This approach would alleviate the protraction of litigation as occurred in the instant case. In fact, during oral argument counsel for the Sextons admitted that trial counsel forgot his lines in not asking Dr. O'Leary a direct question on the issue of proximate cause. Fortunately for the Sextons, Dr. O'Leary provided sufficient testimony to trigger the inference allowed by *Pygman*.

5. Because of our reversal on this issue, we need not address the Sextons' second assignment of error.