# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

Spring 2025 Term

FILED
June 11, 2025

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

_____

No. 24-ICA-263
_____

FRED STARLIPER,
Defendant Below, Petitioner,

v.

ADRIENNE JOHNSON,
Plaintiff Below, Respondent.

_____

Appeal from the Circuit Court of Jefferson County
Honorable Bridget Cohee, Judge
Civil Action No. CC-19-2021-C-20

AFFIRMED, in part, and REVERSED, in part, and REMANDED
_____

Submitted:  April 30, 2025
Filed:  June 11, 2025

David A. Mohler, Esq.
Joshua A. Lanham, Esq.
Bowles Rice LLP
Charleston, West Virginia
Counsel for Petitioner

William C. Brewer, Esq.
Ramsey K. Jorgensen, Esq.
William C. Brewer & Associates, PLLC
Morgantown, West Virginia
Counsel for Respondent

JUDGE WHITE delivered the Opinion of the Court.

WHITE, JUDGE:

This case arises from a 2019 motor vehicle accident involving Fred Starliper and Adrienne Johnson. Mr. Starliper appeals the circuit court's May 27, 2024, order denying his motion for judgment as a matter of law or, alternatively, a new trial following a jury trial that resulted in a judgment against him for $109,476.12. Mr. Starliper does not challenge the jury's finding that he was solely at fault for causing the accident but contests the damages awarded. He also argues that Ms. Johnson should not have been allowed to testify regarding her belief that she might be unable to work for several weeks if she had carpal tunnel release surgery and her concern that she might lose her job during that period of disability. Based upon our review of the record and applicable law, we affirm in part, and reverse in part, the circuit court's order and remand for further proceedings consistent with this opinion.

## I.    FACTUAL AND PROCEDURAL HISTORY

On March 2, 2019, while she was at a stop sign waiting to merge onto Route 9 near Ranson, West Virginia, a vehicle driven by Mr. Starliper struck Ms. Johnson's rental car. Ms. Johnson reported immediate pain and was taken by ambulance to Jefferson Medical Center. At the time, she complained of neck pain and headaches.[1] During her stay

---

[1]According to Ms. Johnson, her post-accident neck pain was "overwhelming" and "all consuming." She testified at the trial of this matter that when the ambulance personnel asked her to rate her pain on a scale of ten, she said "eleven."

in the emergency room, Ms. Johnson did not complain of any problems with her wrists or fingers. She was discharged the same day as her accident with prescriptions for pain relievers and a muscle relaxer.

Over the next several weeks, Ms. Johnson continued to suffer from neck pain and stiffness, although she reported that her headaches gradually subsided. According to Ms. Johnson, within three weeks of her accident, after returning to work, she began to experience coldness, numbness, and tingling in her wrist and fingers, primarily on the right side. Because she had never experienced these symptoms before, and because she was still having neck pain, she made an appointment with Dr. Sarah Levy, M.D., a general practitioner with the Allegheny Health Network, who saw her on May 22, 2019. Ms. Johnson told Dr. Levy of her neck pain and her concern that she had reinjured her neck, which she had previously injured in a 1986 motor vehicle accident.[2] Ms. Johnson also testified that she informed Dr. Levy of the problems with her wrists and fingers, but the office notes for this visit do not mention these issues. Dr. Levy referred her to physical therapy for treatment of her reported injuries.

---

[2] In 1986, Ms. Johnson was involved in an unrelated motor vehicle accident where she was rear-ended and suffered injuries to her neck and hips. As a result of the injuries she sustained in that accident, she underwent physical therapy, and according to her, had completely recovered by 1990 and was not in any pain at the time of the accident involved in this case, almost thirty years later.

Between the time she saw Dr. Levy and the time her physical therapy started, Ms. Johnson realized that she could not move her arm properly while trying to swim. She testified that her first round of physical therapy was mainly related to moving her arm. After she completed this round of physical therapy, the COVID-19 pandemic occurred, and Ms. Johnson stopped receiving medical care. During this time, she used CBD oils, a neck massager device, copper bracelets, and various other home remedies to relieve her pain and discomfort.

In January of 2021, she felt a tearing sensation in her shoulder while lifting a bag of trash. According to Ms. Johnson, this incident aggravated the pain she had been having in her right shoulder since the 2019 accident. She could not schedule a follow-up appointment with Dr. Levy until March of 2021 due to the COVID-19 pandemic, at which point she received a second referral for physical therapy. The notes for this office visit indicate that Ms. Johnson complained of bilateral wrist pain, in addition to her neck and shoulder pain. Dr. Levy diagnosed her with chronic right shoulder pain, acute right wrist pain, and bilateral carpal tunnel syndrome. These are the first medical records which mention complaints of wrist pain.

Ms. Johnson requested an orthopedic referral in November of 2021 and saw Dr. Steven Regal, M.D., an orthopedic surgeon specializing in hand and wrist problems, in

December of 2021.[3] During that appointment, Dr. Regal diagnosed Ms. Johnson with chronic right shoulder pain, bilateral carpal tunnel syndrome, acute pain of the right wrist, hand pain, pain of the upper extremity, cervical radiculopathy, and right carpal tunnel syndrome. He ordered a nerve conduction study, which confirmed the diagnosis of right carpal tunnel syndrome. He also referred her to a spine specialist to evaluate her continued neck and shoulder pain and cervical radiculopathy.

On January 7, 2022, Ms. Johnson had an office visit with Dr. Ryan Sauber, M.D., the spine specialist, who diagnosed her with cervical spondylosis and chronic neck pain. He recommended conservative treatment with medical management of her symptoms, activity modification avoidance, physical therapy, and topical modalities. He referred her to a third round of physical therapy, and his office notes indicate that if this conservative treatment did not provide relief, that she could return to see him and that he would then consider referring her for an MRI scan. He also recommended carpal tunnel release surgery for her hand and wrist problems.

In February of 2022, Ms. Johnson again saw Dr. Regal who provided injections for her carpal tunnel syndrome and recommended a wrist brace. In March of 2022, Ms. Johnson returned to Dr. Regal and obtained another referral for physical therapy.

---

[3] Ms. Johnson testified that when she saw Dr. Regal she was suffering from "the same pain… that I had from the time of the accident, from my neck, my arm .., my shoulder and down into my hand."

Ms. Johnson returned to Dr. Regal for a fourth visit in February of 2023 and he administered additional injections for carpal tunnel syndrome and pain at the base of her thumbs. At the time, she did not want release surgery for her carpal tunnel syndrome because it was responding well to conservative treatment, and she wanted to avoid having surgery for as long as possible.[4]

Ms. Johnson filed a personal injury action against Mr. Starliper in the Circuit Court of Jefferson County. At the pre-trial conference in this case, Mr. Starliper moved to strike portions of Dr. Regal's testimony relating to physical therapy which might be required after carpal tunnel surgery, arguing that Ms. Johnson did not prove the necessity of such future physical therapy to a reasonable degree of medical certainty.[5] The circuit court agreed and granted Mr. Starliper's motion to strike, ordering that: "Plaintiff is prohibited from introducing any opinion evidence from Dr. Regal that the Plaintiff requires physical therapy in the future."

In his evidentiary video deposition, which was played at trial, Dr. Regal repeatedly testified to a reasonable degree of medical certainty that Ms. Johnson's injuries

---

[4] Ms. Johnson testified that she was "trying to put that [surgery] off as much into the future as I can. There is going to come a time though when I have to do it. I am figuring that the progression of this injury leads to your hand begins to---your muscles begin to waste away." She also stated that she would have the carpal tunnel release surgery "when the pain gets to the point and the injury gets to the point that I can't work anymore."

[5] Dr. Regal testified that only 10% of his patients who had carpal tunnel surgery required physical therapy post-surgery.

and complaints, including her neck pain and stiffness and her wrist and finger problems, could have been caused or contributed to by her 2019 motor vehicle accident. Dr. Regal also testified to a reasonable degree of medical certainty that although Ms. Johnson wanted to avoid surgery, her carpal tunnel syndrome would progress, and she would require corrective surgery "in the near future." Unfortunately, according to Dr. Regal, the carpal tunnel surgery would not resolve Ms. Johnson's neck and shoulder pain, which she continued to experience.

At trial, Ms. Johnson testified that since the 2019 accident, she has to sleep on her back without a pillow or she will wake up in excruciating pain. She further testified that she can no longer hike or ride a bicycle and still has problems with her neck, wrists, and shoulder. Ms. Johnson testified that she believed the 2019 accident caused her ongoing physical problems and that she has not returned to her normal life following the 2019 accident due to her physical limitations.

Ms. Johnson also testified that she had not yet had carpal tunnel surgery because it might make her physical condition worse, and there would be a period of time following surgery when she could not use her hand, which she estimated would last six to twelve weeks. Defense counsel objected to this testimony and moved to strike these statements on the grounds that Ms. Johnson, who was not a health care professional, was giving medical testimony. The circuit court overruled the objection, reasoning that Ms.

Johnson was not giving a medical opinion; she was merely explaining why she did not want to have surgery yet.

As for Ms. Johnson's out-of-pocket expenses, documentary evidence supported her expenses for Uber and Amtrak when she lost the use of her rental car in the 2019 accident and Mr. Starliper does not dispute these charges for alternative travel. Ms. Johnson also alleges that she had out-of-pocket charges for prescription medications and parking for physical therapy sessions, expenses which Mr. Starliper contests. Finally, Ms. Johnson and one of her daughters testified that Ms. Johnson incurred additional out-of-pocket expenses for CBD ointment, copper bracelets, a wrist brace, and unused time/miles from the rental car agreement following the accident, but the amount of these losses were never quantified or supported by documentary evidence.  Apart from the wrist brace, Ms. Johnson did not present medical testimony that these alleged expenditures, whatever their amount might have been, were reasonable and necessary.

The jury found that Mr. Starliper solely caused the accident and awarded Ms. Johnson $25,000 for past medical and pharmacy bills; $1,000 for out-of-pocket expenses; $25,000 for past pain and suffering; $1,792 for lost income; $0 for lost enjoyment of life; $26,000 for future medical expenses; and $26,000 for future loss of enjoyment of life and pain and suffering. The circuit court added prejudgment interest in the amount of $4,658.12 to the verdict resulting in a judgment of $109,476.12.

Following the judgment, Mr. Starliper filed a Motion for Judgment as a Matter of Law, or, in the Alternative, Motion for New Trial. In this motion, he argued that Ms. Johnson failed to prove that the 2019 accident proximately caused her carpal tunnel syndrome. Consequently, he alleged that the jury's award for Ms. Johnson's past medical bills was excessive, and that she was not entitled to any damages for future medical expenses. Furthermore, her award for out-of-pocket expenses was allegedly excessive because it was greater than the evidence presented at trial would support. Finally, he contended that the circuit court erred in allowing Ms. Johnson to testify that she had not had carpal tunnel surgery as of the date of trial because she was concerned that she would not be able to work for six to twelve weeks following surgery, and that she might be replaced at work during this period of disability.[6]

On May 27, 2024, the circuit court entered an order denying Mr. Starliper's motion. Mr. Starliper appeals from this order.

## II. STANDARD OF REVIEW

Orders granting or denying a post-trial motion for judgment as a matter of law are reviewed de novo. Syl. Pt. 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009); *Gregory v. Long*, No. 23-ICA-421, No. 23-ICA-422, 2024 WL 4041383, at *3 (W.

---

[6] Mr. Starliper also asserted that the expert witness disclosure for Dr. Regal had not indicated that the doctor would provide any opinions concerning causation, but that disclosure issue was not raised on appeal.

Va. Ct. App. Sept. 4, 2024) (memorandum decision). "A motion for [judgment as a matter of law] may properly be granted only when it appears from all the evidence presented that the party against whom the verdict is sought would not be entitled to a verdict under any view of the evidence." *Roberts v. Stevens Clinic Hosp., Inc.*, 176 W. Va. 492, 499, 345 S.E.2d 791, 798 (1986). "[W]hen considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party." *Blackrock Enter., LLC v. BB Land, LLC*, 250 W. Va. 123, 133, 902 S.E.2d 455, 465 (2024) (internal quotation marks and citation omitted).

Regarding the standard of review for rulings on motions for new trial, the Supreme Court of Appeals of West Virginia ("SCAWV") has explained:

> The ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, [and] the trial court's ruling will be reversed on appeal [only] when it is clear that the trial court has acted under some misapprehension of the law or the evidence.

*Grimmett v. Smith*, 238 W. Va. 54, 59-60, 792 S.E.2d 65, 70-71 (2016) (quotation marks and citations omitted). Furthermore,

> In determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true.

9

*Webb v. North Hills Group, Inc.*, ___ W. Va. ___, ___ n.12, 914 S.E.2d 275, 282 n.12 (2025) (quoting Syl. Pt. 3, *Walker v. Monongahela Power Co.*, 147 W. Va. 825, 131 S.E.2d 736 (1963)) (internal quotation marks omitted).

Finally, we note that questions regarding the admissibility of evidence are entrusted to the sound discretion of the trial court, "but to the extent the circuit court's ruling turns on an interpretation of the *West Virginia Rules of Evidence*, our review is plenary." *State v. Jessica Jane M.*, 226 W. Va. 242, 251, 700 S.E.2d 302, 311 (2010) (per curiam). With these standards in mind, we now address Mr. Starliper's arguments on appeal.

### III.  DISCUSSION

Mr. Starliper raises five assignments of error. However, for purposes of consideration and disposition, we have consolidated these into two main arguments. *See Tudor's Biscuit World of Am. v. Critchley*, 229 W. Va. 396, 402, 729 S.E.2d 231, 237 (2012) (per curiam) (consolidating assignments of error). First, Mr. Starliper argues that the circuit court erred in denying his motion for judgment as a matter of law because Ms. Johnson did not introduce sufficient expert testimony demonstrating that the accident proximately caused her injuries. Second, he argues that he was entitled to judgment as a matter of law on various damages awarded by the jury because they were not supported by evidence.[7]

---

[7] Mr. Starliper also asserted that Ms. Johnson should not have been allowed to testify concerning her belief that she would be unable to work for several weeks if she had carpal tunnel release surgery, and that she might lose her job during this period of disability. We

10

## A. Causation

On appeal, Mr. Starliper asserts that the medical testimony in this case was not sufficient to establish Ms. Johnson's physical injuries related to the 2019 accident other than temporary headaches and a temporary exacerbation of pre-existing neck problems. Accordingly, we begin our analysis by identifying the general rules concerning the evidence required to prove causation in personal injury litigation. In some cases, the cause of an injury should be obvious, even to a lay person, and expert testimony is not required to establish causation. *See Smith v. Slack*, 125 W. Va. 812, 26 S.E.2d 387, 389 (1943) ("It would not be necessary to call an expert to advise a jury of the cause of death where it appears without dispute that the decedent was blown to pieces by an explosion of dynamite, or had been run over by a train, or had been shot through the head with a pistol."); *Roof Serv. of Bridgeport, Inc. v. Trent*, 244 W. Va. 482, 499-500, 854 S.E.2d 302, 319-20 (2020) (broken bones, abrasions, wounds, bruising, and trauma related cardiac events were direct and obvious results of a traumatic event and within the knowledge and experience of jurors).

conclude that the circuit court did not abuse its discretion in allowing Ms. Johnson to testify about why she had not had carpal tunnel surgery because she was not giving a medical opinion, she was merely explaining why she had not yet undergone a surgical procedure recommended by her treating physicians. Moreover, regardless of whether the circuit court erred or not regarding the admissibility of Ms. Johnson's testimony about carpal tunnel surgery, our holding below related to the proximate cause of Ms. Johnson's carpal tunnel moots the issue and any error that might have occurred was harmless.

However, in cases where injuries and their causes and effects are not "direct and obvious and within the knowledge and experience of jurors," expert testimony to a reasonable degree of medical probability is usually necessary. *Id*. For example, expert testimony is required when a case involves "obscure" injuries "not readily observable or understood," such as cancers caused by toxic exposures or subtle cognitive changes caused by closed head injuries. *Id.* at 500, 854 S.E.2d at 320. In such cases, the best "practice would be to ask an expert a direct question as to whether or not an injury was" caused by the defendant's conduct, so as to elicit testimony that the defendant's conduct proximately caused the injury. *Sexton v. Grieco*, 216 W. Va. 714, 720 n.4, 613 S.E.2d 81, 87 n.4 (2005) (per curiam).

But "rigid incantation[s]" concerning causation are not required. *Hovermale v. Berkeley Springs Moose Lodge No. 1483*, 165 W. Va. 689, 696, 271 S.E.2d 335, 340 (1980). Expert testimony that an injury "could have been" or "might have been" caused by an accident, when coupled with other corroborating circumstantial evidence or lay testimony, may be sufficient to create a reasonable inference of causation which allows the issue to go to the jury. *See Pygman v. Helton*, 148 W. Va. 281, 134 S.E.2d 717 (1964) (court concluded that evidence that the plaintiff had not suffered pain in the area of a hernia prior to his motor vehicle accident, that a physical examination prior to the accident had not revealed a hernia, and that the surgeon who repaired the hernia testified that the accident "could have" caused the hernia was sufficient to warrant a reasonable inference that the accident had proximately caused the hernia); *Myers v. Pauley,* No. 12-0718, 2013 WL

12

3184917 (W. Va. June 24, 2013) (memorandum decision) (evidence was sufficient to warrant a reasonable inference of proximate cause where treating physicians testified that hip fracture which was not diagnosed at time of emergency room visit was consistent with plaintiff's description of how the accident occurred, and that the injury was one commonly found in motor vehicle accidents, but could not say to a reasonable degree of medical probability that the injury had been caused by the accident).[8]

However, uncorroborated expert testimony that a party's conduct "could have" or "might have" caused an injury is insufficient, by itself, to support a reasonable inference of causation. *See Serbin*, 157 W. Va. at 76, 198 S.E.2d at 143 (finding expert's testimony that accident was a possible cause of plaintiff's injury insufficient to support jury inference of causation where other evidence did not support testimony); *Pygman*, 148 W. Va. at 288, 134 S.E.2d at 722 (distinguishing case from prior holdings "that the opinion evidence of a physician as to the possibility of a causal relationship between a negligent act and a subsequent condition . . . **standing alone**, was not sufficient to establish such causation") (emphasis added). We have recognized that such an inference is unwarranted

---

[8] The principle recognized in *Pygman* that proximate causation can be established through reasonable inference has been repeatedly reaffirmed by the SCAWV. *See, e.g., Serbin v. Newman*, 157 W. Va. 71, 76, 198 S.E.2d 140, 143 (1973) (per curiam) ("We reaffirm the rule expressed in Pygman v. Helton…"): *Sexton v. Grieco*, 216 W. Va. 714, 719-20, 613 S.E.2d 81, 86-7 (2005) (per curiam) (holding that the adoption of the MPLA did not "*prohibit* the proximate cause inference allowed by *Pygman*" and "[c]onsequently, it was reversible error for the trial court to grant judgment as a matter of law to the defendants on the grounds that proximate cause could not be established through inferences.").

where there is evidence in the record of multiple possible causes of a plaintiff's injury, and the expert testifies only that the defendant's negligence could have been the cause. *See Stoudt v. Eads*, 248 W. Va. 583, 591-92, 889 S.E.2d 305, 313-14 (Ct. App. 2023) (finding expert testimony that foreign object in plaintiff's abdomen could have caused her abdominal pain insufficient to support an inference of causation where record demonstrated multiple other potential causes, and the plaintiff had suffered from abdominal pain both before the object was implanted and after it was removed).

These general principles provide the framework for our causation analysis of Ms. Johnson's main complaints, neck and shoulder pain and carpal tunnel syndrome.[9] As discussed below, we hold that Ms. Johnson presented sufficient evidence to establish that the 2019 accident caused or exacerbated her neck and shoulder problems, but not her carpal tunnel syndrome and other hand injuries.

### 1. Neck and Shoulder Pain

Ms. Johnson testified at trial that her neck pain following the 2019 accident was immediate and severe, and that her neck and shoulder pain continued up through the date of trial. She also testified that although she had previously injured her neck in a 1986

---

[9] During her emergency room visit, Ms. Johnson also complained of headaches, which gradually subsided over the next few weeks. She testified that she believes that she hit her head during her accident. The evidence adduced at trial was sufficient for the jury to find that her headaches, which initially manifested during her emergency room visit, were proximately caused by her 2019 accident.

accident, that condition had resolved with physical therapy, and she had not had any problems with her neck for almost thirty years when the 2019 motor vehicle accident occurred. Dr. Regal, one of her treating physicians, repeatedly opined that the accident "could have" or "might have" caused or exacerbated her neck problems, and when pressed, testified, to a "reasonable degree of medical certainty," that "I believe her neck pain and stiffness *is* attributable to the motor vehicle collision." (Emphasis added).[10] We find that this evidence was sufficient to create a jury issue concerning the proximate cause of her neck and shoulder injuries.

Mr. Starliper's expert, Robert Circione, M.D., who reviewed Ms. Johnson's medical records but did not examine or treat her, testified that the 2019 accident temporarily exacerbated her allegedly pre-existing neck pain.[11] According to his reading of the emergency room records, Ms. Johnson had never fully recovered from her 1986 accident

---

[10] While Dr. Regal framed this specific opinion in terms of Ms. Johnson's neck pain and stiffness, he also linked her neck pain with her shoulder pain. Indeed, Mr. Starliper's counsel specifically elicited testimony from Dr. Regal linking the two injuries, discussing how cervical arthritis (which can be exacerbated by mechanical trauma such as a motor vehicle accident) and resulting radiculopathy could "explain the pain in her neck and also in her right shoulder" because "nerves come out of the neck, [and] go into the shoulder before they go down the arm."

[11] Dr. Circione testified:

> Did she have some increase in neck pain at the time of the accident as shown by the emergency room record March 9th [sic]? Yes. Would I expect that? Yeah. How long does that last? How long does a sprained ankle last? How long? Usually, six weeks, eight weeks. That is usually the time you get patients back to what's called their baseline.

because she was supposedly taking medications for arthritis, muscle spasm, and pain when her 2019 accident occurred. According to the emergency room records, however, the only medication she was taking when she was admitted to the emergency room was albuterol for her breathing.[12] Apart from this expert's interpretation of the emergency room records, no evidence existed that Ms. Johnson had been taking any other medications at the time of her 2019 accident.[13] When cross-examined, the expert was unable to explain why medications for arthritis, muscle spasm and pain were not listed as pre-admission medications on the emergency room records if Ms. Johnson had actually been taking them before the accident, stating that you would have to ask the emergency room staff why that was not done. The jury was not required to accept the expert's interpretation of the medical records and based upon their findings, did not. Accordingly, we find no error in the circuit

---

[12] The "Medication List" at page three of Ms. Johnson's emergency room records lists only albuterol in the "Prior to Admission" section while the "Discharge Medication List" section includes albuterol, hydrocodone (Norco), ibuprofen (Motrin), and cyclobenzaprine (Flexeril). Albuterol was designated as "Entered" on March 2, 2019, while the other three medications were designated as "Ordered" on March 2, 2019. Albuterol does not have a start date on this list, but the other medications all have start dates of "3/2/2019," the date of the accident. Moreover, the "Discharge Medication List" at pages six to seven of the emergency room records indicates "**START** taking these medications" and then lists Flexeril, hydrocodone (Norco), and ibuprofen (Motrin) (Emphasis added). In addition, the "Instructions" on the "AFTER VISIT SUMMARY" say to "**START** taking" Flexeril, hydrocodone (Norco), and ibuprofen (MOTRIN) (Emphasis added).

[13] Mr. Starliper's expert also relied on a statement in Dr. Sauber's office notes indicating that Ms. Johnson's neck problem had "worsened" after her 2019 accident, arguing that a problem could not "worsen" unless it already existed. Dr. Sauber's statement was ambiguous at best because the same office note identifies her "Chief Complaint" as "Right sided neck pain **since** March 2019 following an MVA." (Emphasis added). Similarly, Dr. Regal's office note of December 2021 noted "a history of neck stiffness **following** an MVC in 2019…" (Emphasis added).

court's denial of Mr. Starliper's motion for judgment as a matter of law regarding the proximate cause of Ms. Johnson's neck and shoulder injuries and headaches and affirm, in part, the circuit court's May 27, 2024, order.

## 2. Carpal Tunnel Syndrome & Other Hand Complaints

During his evidentiary deposition, Dr. Regal repeatedly stated that Ms. Johnson's hand and wrist complaints "could have" or "might have" been caused or exacerbated by her motor vehicle accident of 2019. His strongest statement concerning carpal tunnel syndrome was that "I believe her new onset of worsening hand numbness **can be attributed** to a motor vehicle collision." (Emphasis added). He then indicated that this opinion was "to a reasonable degree of medical certainty."

Unlike her neck pain and stiffness, Ms. Johnson's carpal tunnel syndrome did not manifest as soon as she had her accident. Moreover, no evidence existed of any trauma to her wrists or hands when she went to the emergency room, but she did have multiple risk factors for carpal tunnel syndrome unrelated to her accident, such as her age, gender, and occupation. Ms. Johnson testified that she is an attorney who has handled discovery work for law firms since 2001 and continued doing such work after her accident. Ms. Johnson's work reviewing documents involves repetitive use of a mouse and keyboard. Among other activities, she clicks on her mouse every time she opens a document, and she opens about 200 to 250 documents during an eight-hour day. She also repeatedly scrolls down, clicks on boxes, and types comments when reviewing records. We find that the cause

of her carpal tunnel syndrome was not within the knowledge and experience of lay jurors; that Dr. Regal's testimony did not state to a reasonable degree of medical probability that the 2019 accident caused her carpal tunnel syndrome; and that the particular circumstances of this case, combined with his testimony, did not create a reasonable inference of causation. Consequently, we conclude that insufficient evidence existed to establish that the 2019 accident proximately caused Ms. Johnson's carpal tunnel syndrome and, therefore, it was improper for the jury to award any damages related to Ms. Johnson's alleged carpal tunnel injury.[14]

In addition to carpal tunnel syndrome, Dr. Regal diagnosed Ms. Johnson with bilateral trigger thumbs (a condition causing the thumb to catch or lock when it bends) and carpal metacarpal joint arthritis (arthritis at the base of the thumb joint). In his office notes for the February 2022 and February 2023 visits, Dr. Regal mentions that Ms. Johnson experienced pain at the base of her thumbs. In his testimony, he opined that "[h]er thumb pain can be explained by her trigger thumbs, as well as her carpal metacarpal joint arthritis." According to him, both conditions can be idiopathic. Although Dr. Regal opined that arthritis *can* be caused or exacerbated by trauma, he did not say that Ms. Johnson's carpal metacarpal joint arthritis *had* been caused or exacerbated by her motor vehicle

---

[14] The circuit court, although finding just enough evidence to submit this issue to the jury, acknowledged that it was a "close call," and that "[i]t would have been cleaner if the question had been asked in the form of whether or not there is a reasonable degree of medical probability that the carpal tunnel is related to the accident. It's inartful the way the doctor responded."

18

accident. He also stated that "[h]er trigger thumbs are attributed more to her carpal tunnel syndrome than the actual motor vehicle accident." Neither of these conditions, carpal metacarpal joint arthritis and trigger thumbs, seem to have manifested until long after the 2019 accident.[15] For these reasons, we hold that insufficient evidence existed to show that the 2019 accident proximately caused Ms. Johnson's bilateral trigger thumbs and carpal metacarpal arthritis.

Accordingly, we find the circuit court erred in failing to award Mr. Starliper's motion for judgment as a matter of law regarding the causation of Ms. Johnson's carpal tunnel syndrome, carpal metacarpal joint arthritis, and trigger thumbs conditions and remand this matter to circuit court for a new trial on damages, including past medical bills and pain and suffering related to Ms. Johnson's neck and shoulder injuries and headaches associated with the 2019 accident.

## B. Damages

Mr. Starliper challenges the award of any damages for past medical and pharmacy bills other than the emergency room and ambulance charges, out-of-pocket charges other than Ms. Johnson's Uber and Amtrak expenses, and any damages for future

---

[15] Ms. Johnson complained of pain at the base of her thumbs during her February 2022 visit with Dr. Regal. During her February 2023 visit with Dr. Regal, she complained of bilateral thumb pain, as well as some catching and locking. The record does not indicate any incidence or complaints of thumb pain, catching or locking prior to these dates.

medical expenses. Mr. Starliper's counsel stated during oral argument that his client does not contest the award for lost wages.[16]

### 1. Past Medical and Pharmacy Bills

The jury awarded Ms. Johnson $25,000 in past medical and pharmacy bills. Mr. Starliper does not contest $4,995.17 of those damages, which represent the total charges for the ambulance and the emergency room visit, but he does object to the charges for doctor visits ($5,111) and physical therapy sessions ($15,815) after the day of the accident. The sums Ms. Johnson identified at trial for the ambulance, emergency room, doctor visits, and physical therapy sessions equal $25,921.17. Mr. Starliper does not question whether any of these expenses were reasonable and necessary, but he does challenge whether the charges for care rendered after the day of the accident were for treatment of conditions proximately resulting from the accident of March 2, 2019. Having determined that Ms. Johnson's neck and shoulder problems could reasonably be attributed to her 2019 accident, we conclude that the jury could award damages for her treatment of these conditions.

---

[16] He also argued, however, that there had been no expert testimony that Ms. Johnson's neck and shoulder injuries were permanent in nature or would cause pain in the future. To the extent that this argument was raised for the first time in oral argument, we deem it to have been waived. *Freeland v. Marshall*, 249 W. Va. 151, 158 n. 4, 895 S.E.2d 6, 13 n. 4 (2023); *Argus Energy, LLC v. Marenko*, 248 W. Va. 98, 103, 887 S.E.2d 223, 228 (2023).

However, the bills submitted to the jury included charges for treating some conditions unrelated to injuries proximately caused by the accident of 2019, including Ms. Johnson's carpal tunnel syndrome, trigger thumb, and carpal metacarpal arthritis. Charges related specifically and solely to these injuries, such as hand radiographs and injections for carpal tunnel syndrome and trigger thumbs, should not be included in the recovery for past medical and pharmacy bills.

### 2. Out- of- Pocket Expenses

The jury awarded Ms. Johnson $1,000 for out-of-pocket expenses incurred prior to trial. Mr. Starliper does not contest $115.52 of charges for alternative travel after Ms. Johnson's rental car was damaged in the accident ($62.52 for Uber and $53 for Amtrak). Ms. Johnson also claims $60.43 for medications prescribed at the time of her emergency room visit and $36 for parking during physical therapy appointments, as well as undocumented and unquantified expenses for CBD ointment, a wrist brace, copper bracelets, and unused time/miles for her rental car that was damaged during the accident. Based upon our review, we find that Ms. Johnson was entitled to recover the charges for alternative travel, discharge prescriptions, and parking for her physical therapy sessions, but she was not entitled to her alleged expenses for CBD ointment, wrist brace, copper bracelets and unused days on her rental car agreement because she presented no evidence concerning the amount of these charges. In addition, we find that she should not be able to recover for both the unused time on her rental car agreement and the charges for alternative transportation because these damages are redundant. *See generally State ex rel. Maxxim*

*Shared Serv., LLC v McGraw*, 242 W. Va. 346, 353, 835 S.E.2d 590, 597 (2019) (duplicative damages are not allowed).

### 3. Future Medical Expenses

The jury awarded Ms. Johnson $26,000 for future medical expenses. The verdict form completed by the jury does not indicate what medical conditions these alleged expenses relate to, but Ms. Johnson and Dr. Regal testified that future surgery for carpal tunnel surgery would cost $10,885.37. No testimony existed concerning the need for future treatment of Ms. Johnson's neck and shoulder problems or the cost of such care. Having previously determined that insufficient evidence existed to establish that the 2019 accident proximately caused Ms. Johnson's carpal tunnel syndrome, we hold that she was not entitled to any damages for future carpal tunnel surgery. The only other medical condition related to the 2019 accident which might have required future treatment was Ms. Johnson's neck and shoulder pain, but we hold that insufficient evidence existed of the necessity and costs of such treatment to allow recovery for them.

The SCAWV has repeatedly addressed the issue of what kind of evidence is required to enable a jury to award damages for future medical expenses. In *Hall v. Groves*, 151 W. Va. 449, 462, 153 S.E.2d 165, 172 (1967), for instance, the Court instructed that:

> Though a physician who treated him and testified in his behalf stated that plastic surgery for his facial condition and surgery for his arm and wrist could improve his condition, there is no sufficient or definite evidence that such future treatment was

necessary and no evidence with respect to its cost and, consequently, in the absence of any evidence of the cost of such treatment, there was no evidentiary basis for the award of any amount for that element of damages. For that reason the action of the circuit court in refusing to permit a recovery for such future treatment as an element of damages did not constitute error.

More recently, in *Jordan v. Bero*, 158 W. Va. 28, 57-8, 210 S.E.2d 618, 637-38 (1974), the Court stated that:

> There is only scant authority in this country that the need for future medical services and the reasonable value thereof may be inferred from proof of past medical services and their value. Feeney v. Long Island Railway Company, 116 N.Y. 375, 22 N.E. 402 (1889); see generally, 22 Am.Jur.2d Damages [§] 312 (1965). In West Virginia this question has been resolved definitely to the contrary. This Court held in the case of Hall v. Groves, Supra, that proof of future medical expenses was insufficient as a matter of law where there was absence of any evidence to the necessity and [c]ost of such future medical treatment. See also, Pygman v. Helton, Supra; Hailes v. Gonzales, 207 Va. 612, 151 S.E.2d 388 (1966); see generally, 5 M.J. Damages s 26 (1973 Cum.Supp.). To support a relevant instruction on the recovery of future medical expenses, the plaintiff must offer proof to a degree of reasonable certainty which will indicate costs within an approximate range, as well as the necessity and reasonableness of such prospective medical charges. Wendell v. G. C. Murphy Company, 137 W.Va. 135, 70 S.E.2d 252 (1952); see generally, 22 Am.Jur.2d Damages [§§] 102—104 (1965).

Furthermore, the Court held in Syllabus Point 16 of the *Jordan v. Bero* opinion that: "Proof of future medical expenses is insufficient as a matter of law in the absence of any evidence

as to the necessity and cost of such future medical treatment." *See also* Syl. Pt. 4, *Dowey v. Bonnell*, 181 W. Va. 101, 380 S.E.2d 453 (1989) (per curiam).

Although testimony and documentary evidence existed as to what Ms. Johnson's charges for physical therapy had been in the past, Ms. Johnson presented no evidence as to what those alleged expenses would be in the future. Ms. Johnson presented no evidence of what, if any, such treatment would be reasonable and necessary, how often she might need therapy, or what her life expectancy would be. Further, she introduced no evidence as to specific costs, or a range of costs that might be expected.[17] Consequently, the evidence concerning the amount of future medical expenses that allegedly would be incurred was insufficient to support the jury's award.

## IV.    CONCLUSION

In summary, we affirm the circuit court's denial of Mr. Starliper's motion for judgment as a matter of law concerning the proximate cause of Ms. Johnson's neck and shoulder injuries and headaches. We reverse the circuit court's denial of Mr. Starliper's motion for judgment as a matter of law as to causation of Ms. Johnson's carpal tunnel syndrome, carpal metacarpal joint arthritis, and trigger thumbs. We remand this matter

---

[17] Dr. Sauber's office note indicates that he "could consider" having an MRI done if physical therapy and other conservative measures did not resolve Ms. Johnson's issues, but there was no evidence of what an MRI would cost.

24

for a new trial on the issue of Ms. Johnson's damages for past medical expenses related to her neck and shoulder injuries and headaches and associated pain and suffering damages, if any, both past and future.

As for Ms. Johnson's alleged future medical expenses, because they were not supported by evidence at trial, we find that such damages are not recoverable. With respect to Ms. Johnson's out-of-pocket expenses, we find that only the out-of-pocket expenses supported by evidence at trial are recoverable. Those expenses total $211.95 ($62.52 for Uber; $53 for Amtrak; $60.43 for medications prescribed to Ms. Johnson at the time of her emergency room visit; and $36 for parking during physical therapy appointments). We find that Ms. Johnson's lost income damages of $1,792 are recoverable because Mr. Starliper's counsel conceded at oral argument that he did not contest those damages. Accordingly, we remand this case to circuit court for further proceedings consistent with this opinion.

Affirmed, in part, and Reversed, in part, and Remanded.